Oreatha **POWERS**, etc., Plaintiff,

v.

**CSX TRANSPORTATION, INC.,**
**et al., Defendants.**

No. CIV.A.99–0326–RV–S.

United States District Court,
S.D. Alabama,
Southern Division.

July 5, 2000.

Charles R. Godwin, Atmore, AL, for Plaintiff.

Brian McCarthy, Mobile, AL, for Defendants.

## ORDER ON MOTION TO DISMISS

VOLLMER, District Judge.

This matter is before the Court on a Motion to Dismiss filed by defendants Alabama Department of Transportation

("ADOT") and Dykes T. Rushing ("Rushing"). (Doc. 8) The movants have filed a memorandum brief in support of their motion, (Doc. 9), and the plaintiff has filed a principal brief and supplemental brief in opposition. (Docs.13, 15) For the reasons set forth below, the movants' motion to dismiss is **granted** in part and **denied** in part.

Terrence Terrell Rogers died early on November 13, 1997, several hours after the vehicle he was driving was struck by a train owned and operated by defendant CSX Transportation, Inc. ("CSX"). Rogers was struck as he attempted to traverse the CSX track at the Martin Luther King, Jr. crossing in Atmore, Alabama.

The plaintiff's original and first amended complaints alleged only state law causes of action against CSX, G.A. Owens and C.M. Cooper (collectively, "the CSX defendants") and the City of Atmore ("the City"). On March 9, 1999, the plaintiff filed a second amended complaint adding ADOT and Rushing as defendants and asserting federal causes of action for the first time. The defendants timely removed to federal court.

The movants are not named as defendants under Counts One and Two of the second amended complaint, which allege negligence and wantonness against the other defendants. The movants, as well as all other defendants, are sued under Counts Three through Eight, which allege as follows:

- Count Three: deprivation of substantive due process, redressed pursuant to 42 U.S.C. § 1983 ("Section 1983");
- Count Four: deprivation of equal protection of the laws, redressed pursuant to Section 1983;
- Count Five: violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI");
- Count Six: violation of the Thirteenth Amendment;
- Count Seven: violation of 42 U.S.C. § 1982 ("Section 1982");
- Count Eight: violation of 42 U.S.C. § 1985 ("Section 1985").

(Doc. 40 at 20–32) Rushing is sued under each count in both his official and individual capacities.

In general, the plaintiff alleges that the defendants, utilizing federal funds, were involved in the installation of automatic gates with flashing lights at grade crossings within the City that predominantly serve white residents while failing to see that similar devices were installed at the Martin Luther King, Jr. crossing, which predominantly serves black residents.

## LEGAL DISCUSSION

"A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)(citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### A. Claims Against ADOT.

#### 1. Section 1983.

The plaintiff attempts to vindicate Rogers' due process and equal protection rights through the vehicle of Section 1983. ADOT argues that a state is not a "person" that may be sued under Section 1983. Similarly, ADOT argues that it is protected by sovereign immunity under the Eleventh Amendment and that its sovereign immunity has not been abrogated by Congress or waived by the state. (Doc. 8 at 13; Doc. 9 at 2–3) The plaintiff offers no argument to the contrary.

"We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Department of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). "[O]ur holding here ... applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Id.* at 70, 109 S.Ct. 2304.

██ Similarly, Congress did not abrogate the states' sovereign immunity by

enacting Section 1983. *Quern v. Jordan*, 440 U.S. 332, 340–45, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *accord Robinson v. Georgia Department of Transportation*, 966 F.2d 637, 640 (11th Cir.), *cert. denied*, 506 U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 586 (1992).

Thus, ADOT is entitled to summary judgment on the plaintiff's Section 1983 claims if it is an "arm of the state." The Eleventh Circuit recently held that claims against the director of ADOT in his official capacity "are, in effect, claims against the State of Alabama" such that the Eleventh Amendment barred the suit. *Harbert International, Inc. v. James*, 157 F.3d 1271, 1278 (11th Cir.1998); *see also Taylor v. State*, 95 F.Supp.2d 1297, 1310 (M.D.Ala. 2000) (extending Eleventh Amendment immunity to ADOT); *Wright v. Butts*, 953 F.Supp. 1352, 1358 (M.D.Ala.1996)(same). *Cf. Robinson v. Georgia Department of Transportation*, 966 F.2d at 640 (Georgia DOT is an arm of the state for purposes of the Eleventh Amendment).

Because neither *Harbert*, *Taylor* nor *Wright* applied the Eleventh Circuit's factor analysis for assessing "arm-of-the-state" status, the Court does so below. The Court proceeds without the benefit of briefing from either the plaintiff or ADOT[1] and does so only to the extent necessary to satisfy itself that *Harbert*, *Taylor* and *Wright* reached an appropriate conclusion.

"Whether [ADOT] is an arm of the state protected by the Eleventh Amendment 'turns on its function and character as determined by state law.' ... Factors that bear on this determination include the definition of 'state' and 'political subdivision,' the state's degree of control over the

entity, and the fiscal autonomy of the entity." *Fouche v. Jekyll Island—State Park Authority*, 713 F.2d 1518, 1520 (11th Cir.1983)(quoting *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1069 (5th Cir. 1981)). A fourth factor, sometimes subsumed within the "fiscal autonomy" factor, is "who is responsible for judgments against the entity." *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 732 (11th Cir.1984).

a. **"State" versus "political subdivision."** The Court first determines whether state law defines these terms and, if so, in which category the entity fits. *Robinson*, 966 F.2d at 639. Absent such a definition, legislative or judicial descriptions of the entity as a "state agency" indicate the entity is not a political subdivision of the state. *Id.*; *Tuveson*, 734 F.2d at 733; *United Carolina Bank v. Board of Regents*, 665 F.2d 553, 557 (5th Cir.1982)(former Fifth Circuit case). The state's extension of state-law sovereign immunity to the entity is also significant. *Id.* at 558.

The Court is aware of no definition of the term "State" in the Alabama Constitution or elsewhere that expressly includes ADOT or its predecessor, the State Highway Department. However, the Alabama Supreme Court has held that ADOT "is clearly a state agency." *Ex parte Alabama Department of Transportation*, 2000 WL 218295 at 4 (Ala. Feb.25, 2000). Furthermore the Alabama Constitution provides that "the State of Alabama shall never be made a defendant in any court of law or equity," Ala. Const. Art. I, § 14, and the Alabama Supreme Court has held that ADOT partakes of the state's sovereign immunity. *Ex parte Alabama Department of Transportation*, 2000 WL 218295 at 4.[2]

---

1. ADOT, quoting *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), simply assumes that its title as a "department" of itself cloaks it with Eleventh Amendment immunity. (Doc. 9 at 3) While an entity that is truly an agency or department of the state as ascertained utilizing the analysis employed in the text of this opinion is indeed entitled to Elev-

enth Amendment immunity, that analysis, and not simply the entity's name, determines whether it is afforded such immunity.

2. ADOT appears to assume that its state law sovereign immunity directly bars the plaintiff's federal claims brought against it in federal court. (Doc. 9 at 3) It does not. Rather, the Eleventh Amendment alone prescribes the

**b. State's degree of control.** Relevant considerations include such things as the selection and status of directors and employees, reporting requirements, and controls on contracts and land usage.

Gubernatorial appointment of high officials indicates state control. *Harden v. Adams,* 760 F.2d 1158, 1163 (11th Cir.), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 462 (1985); *Fouche,* 713 F.2d at 1520; *United Carolina Bank,* 665 F.2d at 557–58. The chief executive officer of ADOT is the director, who is appointed by, and who serves at the pleasure of, the governor. Ala.Code § 23–1–21. ADOT's chief engineer is appointed by the director but is subject to approval by the governor and the State Board of Registration for Engineers and Land Surveyors. *Id.* § 23–1–22. ADOT's chief counsel and assistant counsel are appointed by the director but are subject to approval by the state attorney general. *Id.* §§ 23–1–25, –26.

Placing the entity's employees within the state employee retirement system indicates state control. *Fouche,* 713 F.2d at 1520. ADOT employees, including counsel, fall within the state merit system. Ala.Code §§ 23–1–26, –28, –33, –36.

The existence of reporting requirements to the state indicates state control. *Harden,* 760 F.2d at 1163 (annual report to the legislature). ADOT is required to submit an annual report to the governor. Ala. Code § 23–1–35.

That contracts are deemed to be with the state indicates state control, as does a requirement of state authorization. *Fouche,* 713 F.2d at 1521. All contracts for road or bridge construction, repair or maintenance "shall be made in the name of the State of Alabama." Ala.Code § 23–1–54.[3] The governor must approve all such contracts. *Id.* §§ 23–1–54, –55.

That real property is owned by the state or held for its use indicates state control. *United Carolina Bank,* 665 F.2d at 558. ADOT's listed powers do not include the power to hold, acquire or dispose of realty. Ala.Code § 23–1–40. Although ADOT possesses the power of eminent domain, *id.* § 23–1–45, the state is the party plaintiff in condemnation proceedings. *See id.* § 23–1–30(4); *State v. Gray,* 723 So.2d 1275 (Ala.Civ.App.1998).

**c. Fiscal autonomy.** Whether the entity's budget is submitted to the state for approval, and whether and to what extent the entity can raise funds on its own, are key considerations. *Robinson,* 966 F.2d at 640; *Harden,* 760 F.2d at 1164; *Fouche,* 713 F.2d at 1520; *United Carolina Bank,* 665 F.2d at 558.

The Court finds no indication that ADOT can raise funds on its own. ADOT receives appropriations from the state, including earmarked net revenues from motor vehicle, tractor and trailer licenses. Ala.Code §§ 23–1–61, –62. ADOT appears to have no power to issue bonds,[4] and even

---

parameters of the state's sovereign immunity from such claims in federal fora. State law sovereign immunity is relevant only as it indicates whether the state considers the entity to be part of the state. It is at best only a rough, overly inclusive gauge of arm-of-the-state status under the Eleventh Amendment, as the Alabama Constitution provides sovereign immunity to entities that do not possess Eleventh Amendment immunity. *Compare, e.g., Carroll v. Hammett,* 744 So.2d 906, 910 (Ala. 1999) (county boards of education are protected by state law sovereign immunity) *with Stewart v. Baldwin County Board of Education,* 908 F.2d 1499, 1501 (11th Cir.1990)(Alabama county board of education has no immunity under the Eleventh Amendment).

**3.** In this case, the Resolutions and Project Agreements with the City, as well as the Supplemental Agreement with CSX, were "entered into by ... the State of Alabama acting by and through the State of Alabama Highway Department [Department of Transportation]." (Doc. 25, Exhibit 3; Doc. 28, Exhibit 1; CSX 400480)

**4.** The state periodically has been authorized to issue state highway bonds. Ala. Const., Amends. 11, 21, 87. Apparently to avoid constitutional restrictions on debt, the Alabama Legislature has authorized the creation of the Alabama Highway Authority and the Alabama Highway Finance Corporation, which are empowered to issue bonds for the cost of constructing roads and bridges. Ala.Code §§ 23–1–155, –170.

when it charges railroads for a portion of the cost of constructing roadways over or under tracks, the charges are assets of the state. *Id.* § 23–1–9.[5]

**d. Source of funds to satisfy judgment.** The burden is on the plaintiff to show that monetary relief would not come from the state treasury. *Fincher v. Florida Department of Labor & Employment Security—Unemployment Appeals Commission,* 798 F.2d 1371, 1372 (11th Cir. 1986), *cert. denied,* 479 U.S. 1072, 107 S.Ct. 1262, 94 L.Ed.2d 124 (1987). Absent a showing that ADOT has other sources of funding and that such funds are not restricted to use for other purposes, the state is necessarily the source of funds to pay any judgment against it in this lawsuit. *Robinson,* 966 F.2d at 640.

■ In summary, analysis of the relevant factors reflects that ADOT may appropriately be considered an arm of the state for Eleventh Amendment purposes. Absent contrary argument from the plaintiff, the Court so considers ADOT for the purposes of this lawsuit only. As an arm of the state, ADOT possesses Eleventh Amendment immunity from suit under Section 1983 and is not a "person" subject to suit under Section 1983.

**2. Title VI.**

Title VI of the Civil Rights Act of 1964 provides as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

ADOT first argues that its Eleventh Amendment immunity extends to claims brought under Title VI. (Doc. 9 at 3) However, Congress has explicitly provided that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... title VI of the Civil Rights Act of 1964 ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d–7(a)(1).[6] This language constitutes a sufficiently clear expression of congressional intent to condition participation in the funded programs on the state's waiver of sovereign immunity. *Sandoval v. Hagan,* 197 F.3d 484, 493–94 (11th Cir. 1999), *petition for cert. filed,* (May 30, 2000).

■■ Congress may, in the exercise of its Spending Clause authority, validly condition its grants of federal funds on a state's agreement to take, or refrain from taking, specified action, as long as the conditions are not so coercive as to negate the voluntariness of the state's agreement. *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 119 S.Ct. 2219, 2231, 144 L.Ed.2d 605 (1999). Title VI was enacted pursuant to the Spending Clause. *Davis v. Monroe County Board of Education,* 120 F.3d 1390, 1398 (11th Cir.1997)(en banc)(citing *Guardians Ass'n v. Civil Service Com'n,* 463 U.S. 582, 598–99, 629, 638, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)), *rev'd on other grounds,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). The state's acceptance of federal funding after the effective date of Section 2000d–7 therefore constitutes a waiver of Eleventh Amendment immunity from suit under Title VI. *Sandoval v. Hagan,* 197 F.3d at 493–95. Accordingly, ADOT's Eleventh Amendment immunity does not extend to the plaintiff's Title VI claim.

---

**5.** "[W]hen the entity's budget is submitted to the state legislature for approval, it is presumed for purposes of the last two factors [fiscal autonomy and state control] that the entity is an agency of the state." *Stewart v. Baldwin County Board of Education,* 908 F.2d 1499, 1509 (11th Cir.1990). The Court has not relied on this presumption.

**6.** This provision applies to all violations occurring after October 21, 1986, *id.* § 2000d–7(b), and it therefore governs this action.

ADOT next argues that Title VI does not apply to federal-aid highway programs but is limited to educational programs. (Doc. 8 at 2; Doc. 9 at 6–7) By its terms, however, Title VI extends to "*any* program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphasis added). The Supreme Court has explicitly stated that "Title VI is applicable to ... highway departments," *Cannon v. University of Chicago,* 441 U.S. 677, 695 n. 17, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and the Secretary of Transportation has promulgated regulations implementing Title VI with respect to the Federal Highway Administration ("FHWA"). *See* 23 C.F.R. §§ 200.1–.13. The Eleventh Circuit has recently applied Title VI to the Alabama Department of Public Safety based on its receipt of federal funds from the Departments of Transportation and Justice. *Sandoval v. Hagan,* 197 F.3d at 501–11.

■ In summary, Title VI extends to the federal-aid highway program at issue here, and the plaintiff's claim against ADOT is not barred by the Eleventh Amendment.

### 3. Thirteenth Amendment.

The Thirteenth Amendment provides as follows:

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation.

U.S. Const., amend. XIII.

ADOT argues that no cause of action exists directly under the Thirteenth Amendment but only under legislation enacted pursuant to that amendment's enforcement clause. Alternatively, ADOT argues that any such cause of action is limited to redressing forms of involuntary labor. (Doc. 8 at 2; Doc. 9 at 7–8)

A number of courts have held that no private cause of action exists directly under the Thirteenth Amendment. *E.g., Bascomb v. Smith Barney Inc.,* 1999 WL 20853 at 6 (S.D.N.Y.1999); *Matthews v. Freedman,* 128 F.R.D. 194, 202 n. 2 (E.D.Pa.1989)(citing cases), *aff'd,* 919 F.2d 135 (3d Cir.1990). The Eleventh Circuit has addressed such a claim at least twice but in each instance disposed of the claim on other grounds, obviating a holding as to whether a cause of action exists directly under the Thirteenth Amendment. *See Arnold v. Board of Education,* 880 F.2d 305, 309, 315 & n. 12 (11th Cir.1989)("[w]hether a claim may be brought directly under the thirteenth amendment remains undecided"; the claim was properly dismissed because the plaintiff claimed involuntary servitude but alleged nothing to indicate the services were performed involuntarily); *Terry Properties, Inc. v. Standard Oil Co.,* 799 F.2d 1523, 1534, 1536 (11th Cir.1986)(after noting in dictum that private defendants "may also be liable directly under the Thirteenth Amendment as it absolutely prohibits the practice of slavery," upholding a defense judgment on the grounds that no badge or incident of slavery was established).

■ Even if a cause of action exists directly under the Thirteenth Amendment, it does not reach conduct such as that alleged here. "[I]t appears that when only the amendment itself is concerned, absent any statute, the amendment is given a very narrow interpretation as to what constitutes the badges and incidents of slavery." *Arnold v. Board of Education,* 880 F.2d at 315 n. 12. "[I]t is true that suits attacking the 'badges and incidents of slavery' must be based on a statute enacted under § 2...." *Channer v. Hall,* 112 F.3d 214, 217 n. 5 (5th Cir.1997)(assuming that a direct cause of action under the Thirteenth Amendment exists, it is limited to "suits attacking compulsory labor"); *see also Crenshaw v. City of Defuniak Springs,* 891 F.Supp. 1548, 1556 n. 7 (N.D.Fla.1995)("All Circuit Court of Appeals cases addressing

direct claims under the Thirteenth Amendment concern forced labor through physical or legal coercion, which directly implicates the prohibition against involuntary servitude."); *Atta v. Sun Co.*, 596 F.Supp. 103, 105 (E.D.Pa.1984)("[C]ourts have declined to hold that the Amendment *itself* reaches forms of discrimination other than slavery and involuntary servitude.")(emphasis in original).

In summary, the plaintiff, who does not allege that Rogers was subjected to involuntary labor, can maintain no cause of action directly under the Thirteenth Amendment.

### 4. Section 1982.

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982.

ADOT argues that its Eleventh Amendment immunity extends to the plaintiff's claim under Section 1982. (Doc. 9 at 4) ADOT cites no supporting authority, and the Court has identified only one case addressing the issue. *See Ross v. State*, 893 F.Supp. 1545, 1550 (M.D.Ala.1995)( "[U]nder § 1982, the Eleventh Amendment is in full force and effect").[7] Noting that the Eleventh Circuit has held that neither Section 1981, Section 1983 nor Section 1985 abrogates the states' Eleventh Amendment immunity, the *Ross* Court discerned no reason to reach a contrary result with respect to Section 1982. This Court concurs with that conclusion.

■ Abrogation of a state's sovereign immunity requires that Congress, in addition to possessing the constitutional power to do so, "express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 243,

105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). The Supreme Court has held that Section 1983 did not abrogate the states' immunity precisely because it did not express an intention to do so with sufficient clarity. *Quern v. Jordan*, 440 U.S. at 345, 99 S.Ct. 1139. Section 1982 contains no clearer an expression of intent to abrogate the states' Eleventh Amendment immunity and therefore, in keeping with *Quern*, the Court must conclude that Section 1982 does not abrogate the states' sovereign immunity.

It may be noted that Section 1983 was enacted pursuant to Congress' power under Section 5 of the Fourteenth Amendment. *Hafer v. Melo*, 502 U.S. 21, 28, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Section 1982, in contrast, was originally enacted as part of the Civil Rights Act of 1866, prior to passage of the Fourteenth Amendment, and its authority was said to rest on Section 2 of the Thirteenth Amendment. *Runyon v. McCrary*, 427 U.S. 160, 170, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976)(discussing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968)). However, Section 1982 was re-enacted as part of the Civil Rights Act of 1870 following ratification of the Fourteenth Amendment. *Housing Authority v. City of Ponca City*, 952 F.2d 1183, 1192 (10th Cir. 1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992). Thus, Section 1982 may be understood as resting on both amendments. *Id.*[8]

This variation in origin, however, furnishes no grounds for reaching a different conclusion concerning sovereign immunity. Section 1981, like Section 1982, boasts the dual parentage of the Thirteenth and Fourteenth Amendments, *Runyon v. McCrary*, 427 U.S. at 170, 96 S.Ct. 2586, and courts of appeal have routinely held that Section 1981, for lack of a sufficiently clear expression of congressional intent, does not abrogate the states' sovereign

---

**7.** The *Ross* Court, in turn, reported that its own independent research had revealed no cases discussing the issue. *Id.* at 1550.

**8.** To the extent that Section 1982 reaches private conduct, it can rest only on the Thirteenth Amendment, as the Fourteenth Amendment requires state action. *Id.*

immunity. *See, e.g., Johnson v. Walgreen,* 1992 WL 357828 at 5 (1st Cir.1992), *cert. denied,* 507 U.S. 1009, 113 S.Ct. 1656, 123 L.Ed.2d 276 (1993); *Mitchell v. Los Angeles Community College District,* 861 F.2d 198, 201 (9th Cir.1988), *cert. denied,* 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989); *Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1184 (7th Cir. 1982). This is also the law of the Eleventh Circuit. *Sessions v. Rusk State Hospital,* 648 F.2d 1066, 1069 (5th Cir.1981). The Fourth Circuit has expressly rejected the argument that Section 1981's relationship to the Thirteenth Amendment requires a different analysis or result than that obtaining under Section 1983. *Freeman v. Michigan Department of State,* 808 F.2d 1174, 1178 (6th Cir.1987).

In summary, the plaintiff's claim against ADOT under Section 1982 is barred by the Eleventh Amendment.

### 5. Section 1985.

 ADOT argues that its Eleventh Amendment immunity extends to the plaintiff's claim under 42 U.S.C. § 1985(3). (Doc. 9 at 3)[9] The Eleventh Circuit has held that Congress did not abrogate the states' immunity in enacting Section 1985. *Fincher v. State of Florida Department of Labor & Employment Security—Unemployment Appeals Commission,* 798 F.2d 1371, 1372 (11th Cir.1986), *cert. denied,* 479 U.S. 1072, 107 S.Ct. 1262, 94 L.Ed.2d 124 (1987). Other courts of appeal have held likewise. *See, e.g., Cerrato v. San Francisco Community College District,* 26 F.3d 968, 975 (9th Cir.1994); *Ferritto v. Ohio Department of Highway Safety,* 1991 WL 37824 at 2 (6th Cir.1991), *cert. denied,* 502 U.S. 1078, 112 S.Ct. 982, 117 L.Ed.2d 145 (1992).

9. While the plaintiff has not expressly identified the subsection under which she is proceeding, her allegations could not fall within any subsection other than (3).

10. Neither ADOT nor Rushing in his official capacity may be retained as a party defendant to the plaintiff's claims under Sections 1982, 1983 and 1985 for the purpose of awarding attorney's fees under 42 U.S.C. § 1988.

In summary, the plaintiff's claim against ADOT under Section 1985(3) is barred by the Eleventh Amendment.

### B. Claims Against Rushing (Official Capacity).

 A suit against a state officer in his official capacity is effectively one against the state and equally offends the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169–70, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). While such an action may proceed to the extent the plaintiff seeks certain forms of prospective equitable relief, *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 102–03, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the plaintiff seeks no such relief but only damages, attorney's fees and costs. (Doc. 40)[10] Accordingly, the plaintiff's claims against Rushing in his official capacity under Sections 1982, 1983 and 1985 are barred by the Eleventh Amendment, while her claim against him under Title VI is not.[11]

### C. Claims Against Rushing (Individual Capacity).

#### 1. Section 1983.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Rushing argues that he is entitled to qualified immunity from the plaintiff's claims because the plaintiff has not alleged the violation of a clearly established constitutional right. The plaintiff responds that

"[W]here a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant." *Kentucky v. Graham,* 473 U.S. at 165, 105 S.Ct. 3099.

11. The plaintiff's Thirteenth Amendment claim against Rushing in his official capacity is barred for the reasons set forth in Part A.3.

she has done so but that, as a threshold matter, Rushing was not performing "discretionary functions" and so cannot claim the cloak of qualified immunity in any event.

> [T]his Court [has] established a two-step analysis to be used in applying the *Harlow* test: the defendant government official must prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred," and then the burden shifts to the plaintiff to demonstrate that the defendant "violated clearly established constitutional law."

*Sammons v. Taylor,* 967 F.2d 1533, 1539 (11th Cir.1992)(quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)).

Thus, "the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority.... If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." *Harbert International, Inc. v. James,* 157 F.3d 1271, 1281 (11th Cir.1998)(emphasis added). The reasoning is that an official acting outside the scope of his discretionary authority is no longer acting as a state official but on his own. *Id.*

The plaintiff is thus correct that discretionary authority is the threshold issue. The plaintiff is incorrect, however, in asserting that Rushing acted outside his discretionary authority.

The plaintiff argues that Rushing, as ADOT's office engineer, was charged to "oversee implementation of the [grade crossing improvement] program and the disbursement of Federal funds." (Doc. 13 at 9) The plaintiff further argues that ADOT, through its agreement with the FHWA, (Doc. 25, Exhibit 3), agreed to comply with all applicable FHWA statutes, regulations, policies and procedures. Those provisions, the plaintiff continues, include requirements that the state disburse funds consistently with established priorities and without discrimination based on race. The plaintiff concludes that ADOT's contractual agreement to comply with these requirements deprived Rushing of any discretion to act otherwise and reduced his to a ministerial function. (Doc. 13 at 9–10; Doc. 15 at 6)

The plaintiff's argument misconstrues the term of art, "discretionary authority." For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when " 'his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.' " *Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir.1988)(quoting *Barker v. Norman,* 651 F.2d 1107, 1121 (5th Cir. 1981)). This definition exposes two critical flaws in the plaintiff's argument.

First, discretionary *authority* does not require the performance of a discretionary *act;* even a ministerial act is within the defendant's discretionary authority if the *Rich v. Dollar* test is satisfied. *Jordan v. Doe,* 38 F.3d 1559, 1566 (11th Cir.1994)(if the defendants were acting pursuant to their job functions and within the scope of their authority, it does not matter "whether such actions be characterized as ministerial or discretionary in nature"); *McCoy v. Webster,* 47 F.3d 404, 407 (11th Cir.1995)("discretionary authority" includes "actions that do not necessarily involve an element of choice").[12]

Second, "[t]he inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but " 'whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.' " *Harbert International v. James,* 157 F.3d at 1282 (quoting *In re: Allen,* 106 F.3d

---

12. In contrast, for purposes of qualified immunity under Alabama state law, "discretionary functions are characterized by planning and decision-making, while ministerial functions are characterized by operational tasks." *Ex parte Alabama Department of Forensic Sciences,* 709 So.2d 455, 458 (Ala.1997).

582, 594 (4th Cir.1997)). For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners. *Id.* (describing *Jordan v. Doe,* 38 F.3d at 1566).

As noted above, the plaintiff insists that Rushing had the duty and the authority to "oversee the implementation of the [grade crossing improvements] program and the disbursement of Federal funds." (Doc. 13 at 9) Given this admission, it necessarily follows that Rushing's alleged conduct in connection therewith, even if ministerial and even if illegal, fell within his discretionary authority.

Because Rushing acted within his discretionary authority, the burden is on the plaintiff to show that Rushing violated clearly established constitutional law.[13] Rushing suggests that this inquiry must be broken into two component parts and that one component—whether the asserted constitutional right exists at all—must be decided before considering whether any such right was clearly established. (Doc. 9 at 5)

In *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the Supreme Court "granted certiorari . . . in order to clarify the analytical structure under which a claim of qualified immunity should be addressed." *Id.* at 231, 111 S.Ct. 1789. The D.C. Circuit had assumed for argument that the plaintiff's allegations, if true, would show the violation of a clearly established constitutional right, but the Court ruled for the defendant because the plaintiff had not adequately supported his allegation of improper motivation (an element of the claim) in opposition to the defendant's motion to dismiss or for summary judgment. *Id.* at 230–31, 111 S.Ct. 1789.

The Supreme Court held that "the first inquiry in the evaluation of such a claim [of qualified immunity][is whether the plaintiff] allege[d] the violation of a clearly established constitutional right" and that the

D.C. Circuit "should not have assumed, without deciding, this preliminary issue in this case, nor proceeded to examine the sufficiency of the allegations of malice." 500 U.S. at 231, 232, 111 S.Ct. 1789. The Court then noted that the threshold qualified immunity question includes both whether the asserted constitutional right exists and that whether it was clearly established. *Id.* at 232, 111 S.Ct. 1789. A threshold decision on this "purely legal question," the Court explained, "permits courts to expeditiously weed out suits which fail the test" without putting the official through a defense on the merits. *Id.* Because the plaintiff's asserted constitutional right did not exist, the Supreme Court affirmed the D.C. Circuit on this basis. *Id.* at 234, 111 S.Ct. 1789.

Lower courts interpreted *Siegert* as suggesting that a ruling on the existence of a constitutional right should precede a ruling on whether the right was clearly established. *See, e.g., Spivey v. Elliott,* 29 F.3d 1522, 1524 (11th Cir.1994). On reconsideration, however, the *Spivey* Court concluded that the Supreme Court did not require such on order of analysis, at least when (as is usually the case) it is simpler to decide that the alleged right was not clearly established than to decide if it exists at all. *Spivey v. Elliott,* 41 F.3d 1497, 1499 (11th Cir.1995); *see also Powell v. Georgia Department of Human Resources,* 114 F.3d 1074, 1080 & n. 8 (11th Cir.1997)(relying on *Spivey* to proceed directly to whether the alleged right was clearly established); *Cottrell v. Caldwell,* 85 F.3d 1480, 1490 (11th Cir.1996)("[W]e have not considered the *Siegert* approach mandatory . . . .").

In 1998, the Supreme Court appeared to strengthen the preference for considering first the existence of the alleged right. In *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), *Siegert* was described as holding that "the better approach" is to address first the existence of the alleged constitu-

---

**13.** This issue may properly be decided on a motion to dismiss. *Williams v. Alabama State*

*University,* 102 F.3d 1179, 1182 (11th Cir. 1997).

tional right and that "[n]ormally," whether the right was clearly established should be addressed only if it is first found to exist. *Id.* at 842 n. 5, 118 S.Ct. 1708. The *Spivey* Court had detected a tension between *Siegert* and the longstanding principle of avoiding constitutional issues if adequate alternate grounds of decision exist, 41 F.3d at 1499, but the *Lewis* Court downplayed such concerns because, "when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity [because the alleged right was not clearly established] requires some determination about the state of constitutional law at the time the officer acted." 523 U.S. at 842 n. 5, 118 S.Ct. 1708. The *Lewis* Court also articulated a new rationale for its preferred order of analysis: "[I]f the policy of avoidance [of constitutional issues] were always followed in favor of ruling on qualified immunity whenever there was no clearly established constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." *Id.*

The Eleventh Circuit, apparently still uncomfortable with unnecessarily deciding constitutional issues, construed *Lewis* as allowing the courts discretion to decide first whether the alleged right was clearly established when the existence of the alleged constitutional right "presents a perplexing question" but any such right "obviously" was not clearly established and the qualified immunity determination disposes of the entire case. *Santamorena v. Georgia Military College,* 147 F.3d 1337, 1343 (11th Cir.1998). Similarly, the Court construed *Lewis* as allowing deviation from the "normal" order of analysis when the existence of a constitutional right "has not been fully briefed by the parties." *Bishop v. Avera,* 177 F.3d 1233, 1236 n. 7 (11th Cir.1999).

So matters stood until April 1999, when the Supreme Court, without fanfare or discussion, stated that "a court *must* first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)(emphasis added). A month later, the Court repeated this statement, this time repeating the justifications expressed in *Siegert* and *Lewis. Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

While applying *Conn* and *Wilson,* the Eleventh Circuit has not squarely addressed whether these cases converted a preferred order of treatment into a mandatory one. *See Hartley v. Parnell,* 193 F.3d 1263, 1270–71 (11th Cir.1999); *Crosby v. Paulk,* 187 F.3d 1339, 1345 (11th Cir. 1999); *McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir.1999).

This Court does not construe *Conn* and *Wilson* as mandating a specific order of analysis to be followed in every case. First, the Supreme Court ordinarily can be expected to acknowledge that it is changing an existing rule. Second, the Court cited *Siegert* and *Lewis* and clearly was aware they do not establish a mandatory scheme. Third, Justice Breyer concurred in *Lewis* for the express purpose of clarifying that *Lewis* "should not be read to deny lower courts the flexibility, in appropriate cases, to decide § 1983 claims on the basis of qualified immunity, and thereby avoid wrestling with constitutional issues that are either difficult or poorly presented." 523 U.S. at 858–59, 118 S.Ct. 1708 (Breyer, J., concurring). Justice Breyer joined the majority opinion in *Conn* and *Wilson,* something he presumably would not have done in silence had he understood those opinions to strip the courts of the "flexibility" left to them by *Lewis.* Fourth, the *Conn* Court's use of the term "must" can reasonably be read as requiring that the existence of a constitutional right be determined first only in the "normal" case envisioned by *Lewis.* The Second Circuit identified most of these reasons, as well as others, in concluding that *Conn* and *Wilson* did not overturn *Lewis. Horne v. Coughlin,* 191 F.3d 244, 248–49 (2d Cir.),

cert. denied, —— U.S. ——, 120 S.Ct. 594, 145 L.Ed.2d 493 (1999);[14] see also Kalka v. Hawk, 215 F.3d 90, 94–98 (D.C.Cir. 2000)(identifying additional reasons for concluding that Conn and Wilson do not mandate an order of analysis in all cases); Kitzman–Kelley v. Warner, 203 F.3d 454, 457 (7th Cir.2000)(describing Conn and Wilson as "repeat[ing] the directive" of Lewis ); Torres v. United States, 200 F.3d 179, 184 (3rd Cir.1999)(citing Wilson for the proposition that a court "need not" reach the clearly established issue if the plaintiff has not established the existence of a constitutional right).

Having concluded that circumstances may warrant deviation from the normal order of analysis, the Court further concludes that the special circumstances identified in Santamorena, Bishop and Justice Breyer's concurrence in Lewis are presented in this case. First, the existence of the constitutional (and statutory) rights asserted by the plaintiff is problematic while, as discussed below, it is obvious that any such rights were not clearly established on November 12, 1997. Second, the parties' briefing on the constitutional and statutory issues is not merely poor but essentially non-existent.[15] Especially when, as here, other parties not partaking of qualified immunity have been sued for violation of such rights but have not moved for dismissal or summary judgment, it is at best inadvisable to make pronouncements as to the existence of such rights absent proper presentation by the parties.

Moreover, the Supreme Court has identified only two rationales for analyzing first the existence of a constitutional right. The first—to honor the policies undergirding qualified immunity by disposing of cases quickly on legal grounds—is equally applicable to the "clearly established" inquiry. The second—to "promot[e] clarity in the legal standards for official conduct," Wilson v. Layne, 526 U.S. at 609, 119 S.Ct. 1692—does not readily apply to decisions of the district courts, which typically are unpublished and which do not create binding precedent in any event. See infra note 16.

Accordingly, the Court concludes that it is appropriate to deviate from the normal order and to address first whether the constitutional and statutory rights asserted by the plaintiff were clearly established on November 12, 1997.

 To be clearly established, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like situated reasonable government agent that what the defendant is doing violates federal law in the circumstances." Lassiter v. Alabama A & M University, 28 F.3d 1146, 1150 (11th Cir.1994)(en banc). To meet this standard, there must be binding precedent,[16] extant at the time of the alleged violation,[17] addressing a materially

14. The majority opinion in Horne v. Coughlin contains an extensive and thoughtful discussion of many of the considerations at work in determining whether and when to pursue the "clearly established" inquiry first.

15. Poor briefing may in some cases be a sign of enlightened self-interest, as "parties may do an inadequate job briefing and presenting an issue that predictably will have no effect on the outcome of the case" because the right, if it exists, was not clearly established. Horne v. Coughlin, 191 F.3d at 247.

16. "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or [when relevant] the highest court of the state where the case arose." Jenkins ex rel. Hall v. Tal-

ladega City Board of Education, 115 F.3d 821, 827 n. 4 (11th Cir.)(en banc), cert. denied, 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997). But see Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)("Petitioners have not brought to our attention any cases of controlling authority in their jurisdiction ... which clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed his actions were lawful."). Assuming that a "consensus of cases of persuasive authority" may satisfy the plaintiff's burden, the plaintiff has made no effort to show such a consensus.

17. "Any case law that a plaintiff relies upon to show that a government official has violat-

similar fact situation.[18]

Absent such clarity in prior case law, the plaintiff can overcome qualified immunity "only by showing that the official's conduct lies so obviously at the very core of what the [constitutional or statutory provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997). This "slender category of cases," *id.* at 1420, represents a "narrow exception" to the "rule requiring particularized case law to establish clearly the law." *Priester v. City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir.2000).

The plaintiff's only effort to meet this massive burden is to cite to several cases addressing race discrimination in a town or city's provision of municipal services.[19] These cases, says the plaintiff, show that "the law is clearly established in this circuit that one cannot be denied the benefits of government-provided services based on race." (Doc. 15 at 7)

A plaintiff, however, cannot shoulder her burden of defeating qualified immunity by reference to such glittering generalities. "[C]ourts must not permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract 'rights.' " *Lassiter v. Alabama A & M,* 28 F.3d at 1150; *see also Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.)(plaintiffs may not rely on "general, conclusory allegations of some constitutional violation, or by stat-

ing broad legal truisms"), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989).

Instead, " 'the facts relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar.' " *Lassiter v. Alabama A & M,* 28 F.3d at 1150 (quoting *Adams v. St. Lucie County Sheriff's Department,* 962 F.2d 1563, 1575 (11th Cir.1992)(Edmondson, J., dissenting)).

The facts of the Eleventh Circuit cases concerning discriminatory provision of municipal services fall woefully short of establishing that Rushing's alleged actions were "so obviously illegal in the light of then existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *Sanders v. Howze,* 177 F.3d 1245, 1249 (11th Cir.1999).

First, of course, the plaintiff's cases deal with the responsibility of a municipality, not a state agency. *See, e.g., Kyle K. v. Chapman,* 208 F.3d 940, 942–43 (11th Cir. 2000)(the plaintiff could not rely on cases imposing liability on health care *professionals* for improper treatment of self-abusive behavior to argue that it was clearly established that *non-professional* health care workers were held to the same standard).

Second, the plaintiff's cases impose liability only for a municipality's own affirma-

ed a clearly established right must pre-date the officer's alleged improper conduct ...." *Ensley v. Soper,* 142 F.3d 1402, 1406 (11th Cir.1998).

**18.** *Lassiter v. Alabama A & M,* 28 F.3d at 1149–50 ("Qualified immunity is a doctrine that focuses on the actual, on the specific, on the details of concrete cases."); *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir. 1993) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."), *modified on other grounds,* 14 F.3d 583 (11th Cir.1994); *Sanders v. Howze,* 177 F.3d 1245, 1249–50 (11th Cir.1999)("[P]revious case law must have developed [the alleged federal right] in a concrete factual context so as to

make it obvious to a reasonable actor that his actions violate federal law.... If no such case law exists, then the defendants are entitled to qualified immunity."); *Harbert International v. James,* 157 F.3d at 1285 (prior case law must be "factually analogous").

**19.** *Ammons v. Dade City,* 783 F.2d 982 (11th Cir.1986); *Hawkins v. Town of Shaw,* 437 F.2d 1286 (5th Cir.1971), *aff'd on rehearing,* 461 F.2d 1171 (5th Cir.1972)(en banc). *See also Dowdell v. City of Apopka,* 698 F.2d 1181 (11th Cir.1983). The plaintiff also cites a district court case from Florida but, as noted above, only binding appellate precedent is relevant to analysis of whether a legal right was clearly established for purposes of qualified immunity.

tive conduct in providing municipal services disproportionately to white citizens. It is unclear whether the plaintiff alleges that ADOT or Rushing personally took any affirmative discriminatory action.[20] The plaintiff cites no case for the proposition that an entity or actor that fails to prevent race discrimination by another may itself be guilty of violating the equal protection or substantive due process rights of the affected persons. Much less has the plaintiff identified any case holding such an entity or actor liable under facts substantially similar to those alleged in this case.

Finally, even if the plaintiff alleges that Rushing affirmatively engaged in discriminatory conduct, the cases on which she relies would not establish that any reasonable state actor in Rushing's position would know his conduct was unlawful. Each of these cases dealt with systemic inequalities directly affecting individual households over entire neighborhoods and covering a wide range of services, including street paving and resurfacing, street lighting, storm drainage (both above and below ground), sewers and water pressure. Each dealt with longstanding, essentially permanent inequalities extending over decades.[21]

 Here, in contrast, the plaintiff alleges discrimination in a single service—grade crossing safety—at five crossings.[22]

More importantly, the plaintiff does not allege permanent inequalities in grade crossing safety, but a relatively short-lived disparity due to non-simultaneous upgrades.[23] The plaintiff can point to no binding case decided before November 12, 1997 making it obvious that any conduct by Rushing in connection with the order or timing of grade crossing improvements within the City violated equal protection or substantive due process. To defeat qualified immunity, the plaintiff's cases "must dictate, that is, truly compel" such a conclusion. *Lassiter v. Alabama A & M*, 28 F.3d at 1150. Because they do not do so, Rushing is entitled to qualified immunity.[24]

## 2. Title VI.

 Rushing argues that, as an individual who "does not receive any federal financial funds or programs," he cannot be sued under Title VI. (Doc. 9 at 6) Rushing cites no authority for this proposition, but the Court's review of applicable law demonstrates that his position is correct.

While the Eleventh Circuit has not addressed whether an individual may be sued under Title VI, *see Wright v. Butts*, 953 F.Supp. 1343, 1350 (M.D.Ala.1996), the Sixth Circuit has dismissed claims against individual defendants under Title VI, apparently because they were not "the entity allegedly receiving the financial assis-

---

20. The plaintiff's brief argues that, after authorizing CSX to proceed with improvements at the Martin Luther King, Jr. crossing, they passively "did nothing to insure that said project was implemented in compliance with Title VI." (Doc. 13 at 6)

21. *See Ammons v. City of Dade City*, 783 F.2d at 988 (history of race discrimination in providing municipal services "throughout [the city's] history"); *Dowdell v. City of Apopka*, 698 F.2d at 1186 ("nearly a half a century" of history); *Hawkins v. Town of Shaw*, 437 F.2d at 1288 ("long history of racial discrimination").

22. The plaintiff relies on the prior installation of active warning devices at four "major" crossings in the City, which are unidentified. (Doc. 40 at 8, 26 & Exhibit 10)

23. As noted, the plaintiff has not identified the four "major" crossings on which she relies, but she has submitted reports of accidents that she alleges occurred at six City crossings prior to installation of active warning devices. (Doc. 40 at 21 & Exhibit 9) The reports reflect there were no active warning devices at Carney as of January 1997; at Wilson or Second as of February 1996; at Presley as of July 1994; at Main as of May 1994; and at Trammell as of March 1994. These documents establish that at least some of the major crossings were upgraded less than two years prior to November 12, 1997.

24. Because the plaintiff's allegations against Rushing do not assert conduct "obviously at the very core of" equal protection and substantive due process protections, the "narrow exception" identified in *Smith v. Mattox* does not apply.

tance." *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir.1996).

Numerous district courts have also held that an individual that does not himself receive federal funding is not a proper defendant under Title VI. *See Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 95 F.Supp.2d 723, 741–42 (N.D.Ohio 2000); *Schuler v. Board of Education*, 2000 WL 134346 at 10 (E.D.N.Y. 2000); *Farmer v. Ramsay*, 41 F.Supp.2d 587, 592 (D.Md.1999); *Lyons v. City of Philadelphia*, 1998 WL 767451 at 3 (E.D.Pa.1998); *Torrespico v. Columbia College*, 1998 WL 703450 at 16 (N.D.Ill. 1998); *A.D.E. Food Services Corp. v. City of Philadelphia*, 1996 WL 590906 at 4 (E.D.Pa.1996)(Judge Kelly); *Wright v. Butts*, 953 F.Supp. 1343, 1350 (M.D.Ala. 1996); *Jackson v. Katy Independent School District*, 951 F.Supp. 1293, 1298 (S.D.Tex.1996); *Clemes v. Del Norte County Unified School District*, 1994 WL 317546 at 4–5 (N.D.Cal.1994); *Robinson v. English Dept. of University of Pennsylvania*, 1988 WL 120738 at 6 (E.D.Pa. 1988)(Judge Vanartsdalen).

The Court's research has located not a single case holding that an individual may be sued in his individual capacity under Title VI. *Cf. Bustos v. Illinois Institute of Cosmetology, Inc.*, 1994 WL 710830 at 2 (N.D.Ill.1994)(finding no cases permitting Title VI claims against individual defendants).

Although the weight and unanimity of authority is persuasive, statutory construction proves dispositive. "Title IX [of the Education Amendments of 1972] was patterned after Title VI of the Civil Rights Act of 1964." *Cannon v. University of Chicago*, 441 U.S. 677, 694, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).[25] In particular, "[t]he drafters of Title IX explicitly as-

sumed that it would be interpreted and applied as Title VI had been during the preceding eight years." *Id.* at 696, 99 S.Ct. 1946 (citing floor comments of Senator Bayh concerning enforcement procedures).

The converse, of course, is equally true, so that precedents construing Title IX are, absent compelling reason to the contrary, equally applicable to the functionally identical language of Title VI. Thus, for example, the Court in *Torrespico v. Columbia College* extrapolated to Title VI the Seventh Circuit's rejection of individual liability under Title IX.1998 WL 703450 at 16 (citing *Smith v. Metropolitan School District*, 128 F.3d 1014, 1019 (7th Cir.1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998)).

While, as noted above, the Eleventh Circuit has not addressed individual liability under Title VI, it has expressly rejected individual liability under Title IX. "A 'Title IX claim can only be brought against a grant recipient ... and not an individual.'" *Floyd v. Waiters*, 133. F.3d 786, 789 (11th Cir.)(quoting *Smith v. Metropolitan School District*), *vacated*, 525 U.S. 802, 119 S.Ct. 33, 142 L.Ed.2d 25 (1998), *reinstated*, 171 F.3d 1264 (11th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 215, 145 L.Ed.2d 181 (1999); *accord Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir. 1999).

Title IX, like Title VI, was enacted pursuant to Congress' power under the Spending Clause. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Spending Clause statutes, including both Title VI and Title IX, "operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not

---

**25.** Title IX provides in pertinent part as follows:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance ....

20 U.S.C. § 1681(a). "The language of Title IX is virtually identical to the language of Title VI." *Davis v. Monroe County Board of Education*, 120 F.3d 1390, 1398 (11th Cir. 1997)(en banc), *rev'd on other grounds*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Because liability for discrimination flows from contract, non-contracting individuals cannot be liable under Title IX. *Floyd v. Waiters*, 133 F.3d at 789. Because the same reasoning applies to Title VI, an individual likewise may not be sued under the latter statute.

The same conclusion is reached by examining the scope of the federal government's enforcement power. "The Government's enforcement power [under Title IX] may only be exercised against the funding recipient, [citation omitted], and we have not extended damages liability under Title IX to parties outside the scope of this power." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. at 641. The reasoning is that it would be "anomalous" for Congress to provide an implied cause of action by private parties extending further than the express enforcement authority possessed by the government. *National Collegiate Athletic Association v. Smith*, 525 U.S. 459, 467 n. 5, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999). Because the enforcement provisions of Title IX and Title VI are substantively identical, *compare* 20 U.S.C. § 1682 *with* 42 U.S.C. § 2000d–1, it would be equally anomalous to allow private suits against non-recipient individuals under Title VI.

In summary, Rushing in his individual capacity may not be sued under Title VI.

### 3. Thirteenth Amendment.

As discussed in Part A.3, *supra*, the plaintiff has no claim under the Thirteenth Amendment.

### 4. Section 1982.

Rushing argues that qualified immunity shields him from suit. (Doc. 9 at 5–6) Rushing cites, and the Court's independent

research has located, no case discussing the availability of qualified immunity in the context of Section 1982. The Court in *Young v. SouthTrust Bank, N.A.*, 51 F.Supp.2d 1274 (M.D.Ala.1999), applied qualified immunity in the Section 1982 context, but without discussion or analysis of the propriety of doing so. *Id.* at 1282.[26] Similarly, the Eleventh Circuit has applied qualified immunity to a Section 1981 claim, again without analysis. *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1378–79 (11th Cir.1997). Accordingly, the Court first addresses whether qualified immunity is a defense to a cause of action asserted under Section 1982.

The Supreme Court has made clear that qualified immunity may extend, not only to constitutional deprivations, but also to statutory ones. *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. 2727 (holding that qualified immunity applies when the defendant has not violated "clearly established statutory or constitutional rights" of the plaintiff).

Like sovereign immunity, the qualified immunity of public officials is a hoary concept that was firmly entrenched when the post-war Civil Rights Acts were passed. Thus, qualified immunity may be asserted as a defense under these Acts unless Congress has clearly expressed its intention to abrogate such immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (Section 1983)("Certain immunities [including qualified immunity] were so well established in 1871, when § 1983 was enacted, that 'we presume that Congress would have specifically so provided had it wished to abolish' them.")(quoting *Pierson v. Ray*, 386 U.S. 547, 554–55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)).

Section 1982 was enacted as part of the Civil Rights Act of 1866 and re-enacted as part of the Civil Rights Act of 1870. *See* Part A.4, *supra*. Accordingly, as with Section 1983, it is susceptible of a qualified

---

**26.** The three Eleventh Circuit cases the *Young* Court cited as support, *id.,* did not address Section 1982.

immunity defense unless Congress has abrogated that immunity.

■ The Eleventh Circuit has held that abrogation of qualified immunity requires a "specific and unequivocal statement" of Congress' intent to do so. *Tapley v. Collins*, 211 F.3d 1210, 1216 (11th Cir.2000)(Federal Wiretap Act). *Compare Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1299–1300 (11th Cir. 1998)(42 U.S.C. § 3617)(reviewing both the text and the legislative history of a statute to determine whether qualified immunity has been abrogated).[27] Section 1982 contains not the slightest indication of an intent to abrogate qualified immunity, much less the required "specific and unequivocal statement" of such intent. Accordingly, qualified immunity is available as a defense to an action brought under Section 1982.

As discussed in Part C.1, *supra*, Rushing's alleged actions fell within his discretionary authority. Accordingly, to avoid dismissal of this claim the plaintiff must either identify binding, pre–1998 case law clearly establishing that Rushing's alleged actions violated Section 1982 or establish that Rushing's alleged conduct so obviously cuts to the core of Section 1982's prohibitions as to obviate such case law. The plaintiff has done neither.

Instead, the plaintiff has simply stated the unobjectionable but unhelpful proposition that "purposeful discriminatory intent may be a basis for causes of action under ... § 1982." (Doc. 15 at 8) It is not the office of this Court to supply the deficiency in the plaintiff's argument. Nevertheless, the Court's review of binding appellate precedent makes clear that Rushing is entitled to qualified immunity.

Binding Fifth and Eleventh Circuit cases have most often addressed Section 1982 in the context of refusals to rent

apartments. *See, e.g., Watts v. Boyd Properties, Inc.*, 758 F.2d 1482 (11th Cir.1985); *Marable v. Walker*, 704 F.2d 1219 (11th Cir.1983); *Bunn v. Central Realty*, 592 F.2d 891 (5th Cir.1979); *Payne v. Bracher*, 582 F.2d 17 (5th Cir.1978); *Gore v. Turner*, 563 F.2d 159 (5th Cir.1977). Several other cases concern the purchase of realty. *See, e.g., Lee v. Southern Home Sites Corp.*, 429 F.2d 290 (5th Cir.1970)(refusal to sell lot); *Dillon v. AFBIC Development Corp.*, 597 F.2d 556 (5th Cir.1979)(refusal to sell dwelling); *Love v. DeCarlo Homes, Inc.*, 482 F.2d 613 (5th Cir.), *cert. denied*, 414 U.S. 1115, 94 S.Ct. 848, 38 L.Ed.2d 743 (1973)(sale and financing of residential property). These decisions flow naturally from the Supreme Court's admonition that Section 1982 "must encompass every racially motivated refusal to sell or rent," *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 421–22, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), but they are irrelevant to the present qualified immunity analysis as this case does not concern the sale or rental of real or personal property.

Other fact patterns include eviction from an apartment, *Sorenson v. Raymond*, 532 F.2d 496 (5th Cir.1976); blocked road access to realty, *Evans v. Tubbe*, 657 F.2d 661 (5th Cir.1981); *Jennings v. Patterson*, 488 F.2d 436 (5th Cir.1974); the siting of public housing projects in predominantly black neighborhoods, *Jackson v. Okaloosa County*, 21 F.3d 1531, 1539 (11th Cir.1994); and the rerouting of a public road and the location of an industrial plant adjacent to a black neighborhood. *Terry Properties, Inc. v. Standard Oil*, 799 F.2d 1523 (11th Cir.1986). These cases as well do not describe the present fact situation.

In *City of Memphis v. Greene*, 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981), the city closed one of five streets entering a white residential neighborhood. A black neighborhood was situated adjacent to the

---

**27.** Resort to legislative history is unnecessary, as the Supreme Court has required that "Congress ... specifically ... provid[e]" for abrogation, *Buckley v. Fitzsimmons*, 509 U.S. at 268, 113 S.Ct. 2606, a standard that necessitates clear statutory language. *Cf. Atascadero*

*State Hosp. v. Scanlon*, 473 U.S. 234, 243, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)("Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself.").

white neighborhood and the closed street, across a four-lane road. *Id.* at 102–03, 101 S.Ct. 1584. The Supreme Court found no violation of Section 1982, but suggested that the statute might be violated if the challenged action: (1) granted a "benefi[t][to] white property owners that would be refused to similarly situated black property owners"; (2) "depreciated the value of property owned by black citizens"; or (3) "severely restricted access to black homes." *Id.* at 123, 101 S.Ct. 1584.

The plaintiff alleges no restricted access, and maps filed with the Court demonstrate that Rogers' neighborhood can be accessed without traversing the Martin Luther King, Jr. crossing. (Doc. 23, Exhibit 4) *Compare Terry Properties v. Standard Oil,* 799 F.2d at 1528, 1536 (a road rerouting that increased travel distance by .7 mile did not, on the facts, sufficiently interfere with access to support a Section 1982 claim). Nor has the plaintiff alleged that any delay in installing grade crossing improvements at the Martin Luther King, Jr. crossing depreciated the value of property in Rogers' neighborhood. Even had the plaintiff made such allegations, she has produced no case law establishing a threshold degree of inconvenience or diminution in value that always offends Section 1982. Nor has she attempted to show that Rushing was or should have been aware that such a threshold degree had or would ensue from his actions.

Instead, the plaintiff seeks to come within the first category identified by the *City of Memphis* Court, alleging that Rushing's conduct "benefited white property owners and leaseholders with respect to safety measures which were refused to similarly situated black property owners and leaseholders." (Doc. 40 at 30) No Fifth Circuit,

Eleventh Circuit or Supreme Court case, however, has clearly delineated what does and what does not constitute such a "benefit." While the Supreme Court in *City of Memphis v. Greene* considered the street closing to be a benefit, 451 U.S. at 119, 101 S.Ct. 1584, this does not "clearly establish" that the grade crossing improvements at issue here constitute a benefit for purposes of Section 1982. The street closing in *City of Memphis v. Greene* was an improvement physically located within the boundaries of the favored neighborhood, and the benefit of the improvement could only be enjoyed by persons physically within the neighborhood.[28] The plaintiff here, in contrast, alleges an unequal "benefit" consisting of grade crossing improvements lying outside Rogers' neighborhood and enjoyable only by leaving the neighborhood. Even if *City of Memphis v. Greene* "suggest[s] or allow[s] or raise[s] a question about" whether a benefit may lie beyond the plaintiff's neighborhood, it does not "dictate, that is truly compel" such a conclusion. *Lassiter v. Alabama A & M,* 28 F.3d at 1150.[29]

 While "the full scope of § 1982 has never been made clear," *Jackson v. Okaloosa County,* 21 F.3d at 1539, such clarity is essential for the plaintiff's Section 1982 claim against Rushing to survive. Since it is lacking, Rushing is entitled to qualified immunity.[30]

#### 5. Section 1985.

 Rushing first repeats his qualified immunity argument. (Doc. 9 at 5–6) However, "[w]e have squarely held that qualified immunity is not available as a defense to a § 1985(3) claim ...." *Johnson v. City of Fort Lauderdale,* 126 F.3d 1372, 1379 (11th Cir.1997); *accord Burrell v. Board of*

---

**28.** These benefits included privacy, quiet, and pedestrian safety. 451 U.S. at 104, 106, 114, 101 S.Ct. 1584.

**29.** Although the Eleventh Circuit in *Terry Properties v. Standard Oil* considered a Section 1982 claim in the context of property use adjacent to the plaintiffs' property, the plaintiffs did not assert they had been denied a benefit afforded similarly situated white per-

sons, and the Court did not consider whether a benefit could arise in this context. *See* 799 F.2d at 1536.

**30.** No serious argument could be maintained that the conduct alleged by the plaintiff lies at the very core of what Section 1982 was designed to prohibit, so as to trigger the "narrow exception" of *Smith v. Mattox.*

*Trustees,* 970 F.2d 785, 794 (11th Cir.1992), *cert. denied,* 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993). The Court's rationale is that the substantive requirement of Section 1985(3) that the plaintiff prove a racial, invidiously discriminatory animus provides a sufficient barrier to public official liability such that an additional hurdle of qualified immunity is unnecessary. *Id.* Accordingly, Rushing's qualified immunity argument fails.

Rushing next argues that the plaintiff has failed adequately to address certain elements of a Section 1985(3) claim, in particular, the defendants' racially discriminatory animus and the existence of an agreement to deprive the plaintiff of a protected right. (Doc. 9 at 8–9)

■ With respect to discriminatory intent, the second amended complaint alleges that "the lack of automatic gates and flashing light signals at the MLK crossing [was] due to purposeful discrimination by Defendants against members of a suspect class to which Plaintiff's son belonged . . . ." (Doc. 40 at 28) Similarly, the second amended complaint alleges that the "Defendants implemented a race-based policy of improving all major crossings in the City of Atmore except the MLK crossing." (Id. at 25) In these and other passages, the plaintiff has adequately alleged that the defendants acted with a racially discriminatory animus.

With respect to an agreement among the defendants, Rushing argues that, "[a]bsent some proof of [such] an agreement," the conspiracy allegation must be dismissed. (Doc. 9 at 8–9) The issue on a motion to dismiss, however, is not "proof" but pleading. Rushing does not argue the plaintiff has failed adequately to plead the existence of an agreement, and a review of the second amended complaint reveals sufficient allegations of such an agreement. For example, the plaintiff alleges that the defendants jointly "establish[ed] a policy" of race discrimination in the provision of railroad crossing safety devices. (Doc. 40 at 23; *id.* at 24, 25)

In summary, Rushing has no immunity from the plaintiff's Section 1985(3) claim, and his challenges to certain elements of the claim are meritless. Whether the plaintiff can prove these elements, or the other elements, of a Section 1985(3) claim, is not properly presented on a motion to dismiss.

## CONCLUSION

The motion to dismiss of defendant ADOT is **granted** with respect to the plaintiff's claims under Section 1983, the Thirteenth Amendment, Section 1982 and Section 1985(3) and **denied** with respect to the plaintiff's claim under Title VI.

Likewise, the motion to dismiss of defendant Rushing in his official capacity is **granted** with respect to the plaintiff's claims under Section 1983, the Thirteenth Amendment, Section 1982 and Section 1985(3) and **denied** with respect to the plaintiff's claim under Title VI.

The motion to dismiss of defendant Rushing in his individual capacity is **granted** with respect to the plaintiff's claims under Section 1983, Title VI, the Thirteenth Amendment and Section 1982 and **denied** with respect to the plaintiff's claim under Section 1985(3).

This disposition does not adjudicate all of the claims of the plaintiff against the movants. Similarly, it does not adjudicate the rights and liabilities of all the parties. Accordingly, under Federal Rule of Civil Procedure 54(b), the Court finds that entry of a final judgment at this time is inappropriate, and judgment will be entered by separate document as required by Federal Rule of Civil Procedure 58 following the resolution of all claims as to all parties.[31]

---

31. As in every case, the Court acknowledges the able assistance of his law clerks in the preparation of this order.